**Kenneth E. KING, Petitioner,**

v.

**David L. DITTER, Respondent.**

No. 06–C–257–C.

United States District Court,
W.D. Wisconsin.

May 30, 2006.

Corey F. Finkelmeyer, Assistant Attorney General, Madison, WI, for Respondent.

## OPINION AND ORDER

CRABB, District Judge.

This is a proposed civil action for declaratory and monetary relief under 42 U.S.C. § 1983. Petitioner Kenneth E. King, a prisoner at the Columbia Correctional Institution in Portage, Wisconsin, contends that respondent David Ditter, the plaintiff's prison job supervisor, lowered his pay and ultimately fired him in retaliation for statements he made and grievances he filed criticizing Ditter's managerial practices. Petitioner requests leave to proceed *in forma pauperis*, as authorized by 28 U.S.C. § 1915. From the financial affidavit petitioner has given the court, I conclude that petitioner is unable to prepay the full fees and costs of starting this lawsuit. He has made the initial partial payment required under § 1915(b)(1).

In addressing any *pro se* litigant's complaint, the court must construe the complaint liberally. *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, when the litigant is a prisoner, the court must dismiss the complaint if the claims contained in it, even when read broadly, are legally frivolous, malicious, fail to state a claim upon which relief may be granted, or seek money damages from a defendant who is immune from such relief. 28 U.S.C. § 1915A.

Petitioner contends that respondent violated his rights under the First and Fourteenth Amendments by retaliating against him for writing a letter of complaint to the warden and by discriminating against him because of his race. Plaintiff's equal protection claim fails because petitioner has not indicated his race or alleged that others of a different race were treated differently than he was. I will give him an opportunity to supplement his complaint. He has succeeded in stating a claim that respondent Ditter retaliated against him and will be permitted to proceed on that claim.

In his complaint, petitioner alleges the following facts.

## ALLEGATIONS OF FACT

### A. *Parties*

Petitioner Kenneth E. King is an inmate at the Columbia Correctional Institution in Portage, Wisconsin. From December 2004 to February 2006, he was employed at the prison by Badger State Industries (BSI). (Badger State Industries is a prison industry program operated by the State of Wisconsin. The division located at the Columbia Correctional Institution offers printing and copying services.)

Respondent David Ditter has been a supervisor at Badger State Industries since October 2005. Before that time, respondent was a unit manager at the Columbia Correctional Institution.

### B. *Petitioner's Employment at Badger State Industries*

Before October 2005, inmates worked from 7:00 a.m. to 3:00 p.m., Mondays through Fridays. Inmates had the option of working one additional hour each day as paid overtime. The maximum hourly pay an inmate could receive was $1.00.

From December 2004 until September 2005, petitioner worked without incident under the supervision of Badger State Industries supervisor Brian Franson. During this time, petitioner completed hundreds of print jobs. None was ever returned because it contained errors. Petitioner received regular promotions and pay increases until he reached maximum pay of $1.00 per hour.

In mid-October 2005, respondent and Franson exchanged jobs. Shortly after respondent became supervisor, work hours were changed from 7:00 a.m. to 4:00 p.m. Mondays through Thursdays, and Fridays from 7:00 a.m. to 11:00 a.m. Respondent did not provide the inmate workers with documentation of the change in schedule. Several weeks later, respondent announced at a shop meeting that certain jobs would no longer be eligible for the maximum pay range. Respondent stated, "There will be reductions, I'm just letting you know."

Several days after the shop meeting, respondent called petitioner into his office after hearing that petitioner and another inmate, Robert Wirth, had "mouth[ed] off" to a staff member about the schedule changes respondent had implemented and had told other inmates that the new work hours were illegal and that respondent could be sued. Respondent told petitioner that he "better stop" and that petitioner should come to him directly with any complaints instead of "mouth[ing] off" to other staff members.

The following week, respondent reduced petitioner's pay from $1.00 an hour to $.92 an hour, falsely stating that petitioner had been making mistakes and having problems with his fellow employees. (Petitioner has never received any conduct reports while incarcerated and has never been disciplined for violating work rules.) When petitioner "voiced his displeasure and disagreement" with respondent's decision to

reduce his pay, respondent told him, "I'm tired of your shit. If you keep mouthing off I'll fire your ass." Out of fear of being fired, petitioner agreed to the pay reduction.

In early 2005, a white inmate named Michael Whip and a Hmong inmate named Da Vang were placed in disciplinary segregation and given conduct reports for engaging in disruptive conduct while working. When Whip and Vang returned to work, their pay was not reduced.

In early 2006, Whip and another inmate, Gordo Davis engaged in a "loud, disruptive argument" and "came close to exchanging blows." Respondent Ditter called Whip and Davis to his office for a discussion but did not decrease their pay.

On November 21, 2005, petitioner sent a letter to Columbia Correctional Institution warden Greg Grams, complaining about the work schedule changes respondent had implemented. Grams responded to petitioner on November 25, 2005, directing him to file an inmate complaint or to write to the Bureau of Correctional Enterprises.

On November 27, 2005, petitioner was called into respondent's office, where respondent "interrogated" him about the letter he had written to Grams. When petitioner denied knowledge of the letter, respondent told him, "Keep it up [and] you and me will have problems."

On February 9, 2006, respondent called petitioner to his office and reprimanded him for allegedly "messing up" two print jobs. As a consequence, respondent reduced petitioner's pay to $.65 an hour. Petitioner was humiliated.

Before any print job is shipped from Badger State Industries, it is must be inspected for errors and approved by an "industry specialist," an employee whose job it is to train and supervise inmates. Both jobs for which petitioner had been reprimanded had been approved by staff members Becky Maas and Michael Van Dusen before they were shipped to customers. Because he did not want to be fired, petitioner signed a form agreeing to the pay reduction.

Approximately five minutes after petitioner left respondent's office, respondent called him back. Respondent said that he had heard petitioner told other inmates that respondent was racist. Respondent told petitioner, "You're done," and fired him on the spot.

Later that day, respondent completed a prison form on which he wrote, "Mr. King quit his job today. He was upset about a pay cut for poor work performance." Prison regulations require inmates to sign a form if they wish to voluntarily terminate their employment. Petitioner signed no such form.

On Monday February 13, 2006, respondent completed an evaluation, which he pre-dated February 12, 2006. (It is unclear why respondent completed an evaluation of petitioner's work almost one week after petitioner was fired.) In the evaluation, respondent stated falsely that petitioner "gave his two week notice and was warned not to disrupt the shop during those two weeks. He immediately went out of the shop area and started bad mouthing staff. At this time, he was terminated immediately." The same day, respondent completed a termination report in which he wrote, "Do not rehire this man, he is very lazy and sneaky." Respondent did this so petitioner would receive collateral discipline.

On February 9, 2006, the day he was fired, petitioner filed an inmate complaint numbered CCI 2006–3911, in which he alleged that respondent had retaliated against him "for exercise of [his] First Amendment rights." The complaint was

rejected the following day by inmate complaint examiner (ICE) Burt Tamminga on the ground that it "contain[ed] more than one issue or the issue [wa] s not clearly identified."

On February 13, 2006, petitioner appealed the rejection of his complaint to Grams and to Bureau of Correctional Enterprises Director Tim Peterson. Petitioner explained:

Due to the fact that the issue complained about was unlawful retaliation for the exercising of 1st Amendment rights and in drafting his complaint the complaintant [sic] merely sets forth unlawful factual occurrences as they caused and related to the same. The factual basis that started the complaint was correspondence sent c/o Warden Grams on 11/21/05 complaining the BSI supervisor Dave Ditter arbitrarily changed the work hours at the BSI ...

Further ICE Tamminga doesn't objectively review complaintants [sic] fairly he only reviews them subjectively without interviewing the complaintant [sic]. Furthermore, DOC 313.09 Discipline [illegible] allows an inmate the right, if he/she chooses to appeal a termination through the I[nmate] C[omplaint] R[eview] S[ystem]. Further still, the complaint [sic] believes ICE Tamminga has mislead [sic] him in appealing to the Warden with regard to his complaint ... For these reasons the complaint must be investigated.

On February 23, 2006, Grams re-opened petitioner's complaint, stating,

This complaint was improperly rejected by the ICE. It has been returned to the ICE for further investigation. Complaint deals with issues related to BSI employment and should be investigated by the ICE for ultimate decision by the BSI [sic] Director.

On March 13, 2005, Tamminga recommended dismissal of petitioner's complaint. His recommendation included the following passage:

Inmate complains of circumstances surrounding his being fired by Mr. Ditter. Mr. Ditter states that the inmate was not fired, he voluntarily quit. This issue boils down to one person's word against the other. To determine exactly what did occur would require speculation on the part of the ICE and that would be improper.

Relying on Tamminga's recommendation, Bureau of Correctional enterprises designee Bernard Spiegel dismissed petitioner's complaint.

Petitioner appealed the dismissal. On April 14, 2006, corrections complaint examiner Sandra Hautamaki recommended that Department of Corrections Deputy Secretary Rick Raemisch deny the appeal, which he did on April 17, 2006.

## OPINION

### A. *Retaliation*

██ To state a retaliation claim under the First Amendment, a prisoner must allege that he engaged in a constitutionally protected activity and that prison officials took adverse action against him because he engaged in the protected activity. An inmate is not required to allege a chronology of events from which retaliation may be inferred but must allege the retaliatory act and describe the protected act that prompted the retaliation. *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir.2002). These minimal facts are necessary to give prison officials adequate notice of the claim against them. *Beanstalk Group, Inc. v. AM General* Corp., 283 F.3d 856, 863 (7th Cir.2002).

██ In this case, petitioner has alleged clearly the actions he undertook (writing a

letter of complaint to the warden and complaining to other inmates and staff members about respondent's decisions) and respondent's allegedly retaliatory responses to those actions (a reduction in petitioner's pay and ultimately the termination of petitioner's employment). Respondent's actions were unquestionably adverse, so the only question is whether the activities in which petitioner engaged were protected by the Constitution. If so, he has stated a claim against respondent; if not, his claim fails.

Petitioner alleges that he made several comments that were critical of respondent and his managerial decisions. In late October, petitioner and inmate Wirth complained to a staff member and to other inmates about the work schedule changes respondent had implemented. Petitioner told other inmates that the new work hours were illegal and that respondent could be sued. Several weeks later, when respondent lowered petitioner's pay, petitioner "voiced his displeasure and disagreement." Finally, on February 9, 2005, when petitioner's pay was lowered a second time, petitioner allegedly told other inmates that respondent was racist.

Because petitioner's complaints about his pay reduction related to a matter of solely personal concern, they were not protected under the First Amendment. *McElroy v. Lopac,* 403 F.3d 855, 858 (7th Cir.2005) (inmate's "inquiries about lay-in pay were matter of purely individual economic importance and not of public concern"). However, petitioner's assertions that respondent's change in the work schedule was illegal and that respondent was racist are allegations that fall within the scope of the First Amendment; the fact that petitioner's decision to voice his complaints may have been motivated in part by personal concerns is not fatal to his claim. *Cygan v. Wisconsin Dept. of Corrections,* 388 F.3d 1092, 1100 (7th Cir. 2004) (although disgruntled prison guard's speech may have been motivated by dissatisfaction and concerns for personal safety, speech touched on issues of internal prison security and was "undoubtedly a matter of public concern"). Therefore, petitioner has made allegations sufficient to state a retaliation claim against respondent based on his verbal comments alone.

Petitioner's letter to the warden furnishes another example of constitutionally protected speech. Numerous appellate court decisions have held that inmates have a right to file complaints regarding the conditions of their confinement and that prison officials violate the First Amendment when they take action against prisoners for filing grievances. *Hoskins v. Lenear,* 395 F.3d 372, 375 (7th Cir.2005) ("Prisoners are entitled to utilize available grievance procedures without threat of recrimination."); *Walker v. Thompson,* 288 F.3d 1005, 1009 (7th Cir.2002) (grievances may be protected by right to petition, right to free speech or right to access courts); *Babcock v. White,* 102 F.3d 267, 275 (7th Cir.1996) (assuming that filing prison grievance implicated prisoner's right of access to courts).

The Wisconsin state prison system provides inmates with a formal administrative process for voicing their grievances, known as the inmate complaint review system. Petitioner's letter to the warden was outside the scope of the formal grievance process provided by the institution; therefore, it was not part of the required administrative exhaustion process and was not constitutionally protected under petitioner's right to "access the courts." Nevertheless, petitioner's letter was intended to alert the warden to work schedule changes petitioner believed were illegal and, like his verbal statements, implicates his right to speak freely on a matter of public con-

cern. Consequently, petitioner's letter was protected speech and any adverse action taken by respondent on the sole ground that petitioner had written to the warden voicing his concerns with respondent's management decisions would be an impermissible act of retaliation.

In recognizing petitioner's retaliation claim at this early stage in the proceedings, I make no assessment of its merit. However, petitioner should be aware that an employee's right to free speech is not unchecked, particularly when the employee is a prisoner. When a prisoner's speech is at issue, the court will balance the interests of the prisoner in commenting upon matters of public concern and the interest of the state in promoting the efficiency of the public services it performs through its employees, giving serious consideration to the potential disruptiveness of the speech in question. *Waters v. Churchill,* 511 U.S. 661, 681–82, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (applying balancing test to free speech rights of public employees); *see also Sasnett v. Litscher,* 197 F.3d 290, 292 (7th Cir.1999) (imputing to inmate free-speech claims requirement of public employee line of cases). It remains to be seen whether petitioner's speech was disruptive to the prison environment and therefore was not protected by the First Amendment despite its connection to matters of public concern. *See, e.g., Cygan,* 388 F.3d at 1101 (prison guard's "loud and profane complaints" in presence of other officers and inmates undermined authority of supervising guard and therefore were not entitled to protection).

### B. *Equal Protection*

■ A plaintiff asserting an equal protection violation must establish that a state actor has treated him differently than persons of a different race and that the state actor did so purposefully. *De-Walt v. Carter,* 224 F.3d 607, 618 (7th Cir.2000). From two facts alleged in petitioner's complaint, I understand petitioner to be alleging an equal protection claim in this lawsuit. First, petitioner alleges that respondent fired him after hearing that petitioner had told other inmates that respondent was "racist." Second, petitioner alleges that respondent did not reduce the pay of three inmate workers, whom he identifies as "white" and "Hmong," even though these inmates engaged in behavior that could be characterized as disruptive. However, petitioner has not identified his race or national origin. Without some indication that petitioner is not "white" or "Hmong" there is no way to tell whether respondents may have treated him differently from inmates of other races or ethnicities. Consequently, I will stay a decision on whether to grant petitioner leave to proceed on his claim that respondent violated his right to equal protection. Petitioner may have until June 9, 2006, in which to supplement his allegations by identifying his race. If he does not do so by June 9, 2006, his request for leave to proceed *in forma pauperis* on his equal protection claim will be denied and the case will proceed on petitioner's retaliation claim only.

### ORDER

IT IS ORDERED that

1. Petitioner Kenneth King's request for leave to proceed *in forma pauperis* is GRANTED with respect to his claim that respondent retaliated against him in violation of the First Amendment for making statements to co-workers and staff members and writing a letter to the prison warden criticizing respondent's alleged racism and allegedly illegal work schedule changes;

2. Petitioner Kenneth King's request for leave to proceed *in forma pauperis* is STAYED with respect to his claim that

respondent violated his right to equal protection under the Fourteenth Amendment. Petitioner may have until June 9, 2006, in which to supplement his allegations by identifying his race.

3. For the remainder of this lawsuit, petitioner must send respondent a copy of every paper or document that he files with the court. Once petitioner has learned what lawyer will be representing respondent, he should serve the lawyer directly rather than respondent. The court will disregard any documents submitted by petitioner unless petitioner shows on the court's copy that he has sent a copy to respondent or to respondent's attorney.

4. Petitioner should keep a copy of all documents for his own files. If petitioner does not have access to a photocopy machine, he may send out identical handwritten or typed copies of his documents.

5. The unpaid balance of petitioner's filing fee is $334.76; petitioner is obligated to pay this amount when he has the means to do so, as described in 28 U.S.C. § 1915(b)(2).

6. Pursuant to an informal service agreement between the Attorney General and this court, copies of petitioner's complaint and this order will be sent to the Attorney General for service on respondent after this court determines whether petitioner may proceed on his equal protection claim.